Caleb E. Mason, Esq. (State Bar No.246653)
Jacqueline Sparagna, Esq. (State Bar No.315275)
WERKSMAN JACKSON & QUINN LLP
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
Telephone: (213) 688-0460
Facsimile: (213) 624-1942
Email: cmason@werksmanjackson.com
Email: jsparagna@werksmanjackson.com

Attorneys for Defendant
MOHAMMAD JAWAD ANSARI

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>    v.<br><br>MOHAMMAD JAWAD ANSARI,<br><br>                    Defendant. | ) Case No.: 2:20-CR-00449-FLA-1<br>)<br>) **DEFENDANT MOHAMMAD**<br>) **JAWAD ANSARI'S**<br>) **SENTENCING MEMORANDUM**<br>) Hon: Fernando L. Aenlle-Rocha<br>) Date: Sep. 29, 2023<br>) Ctrm: 6B<br>) Time: 10 a.m.<br>) |

**TO THE COURT AND ALL PARTIES:**

Defendant Mohammad Jawad Ansari ("Mr. Ansari"), by and through his counsel of record, WERKSMAN JACKSON & QUINN LLP, hereby files his Sentencing Memorandum. Mr. Ansari's position is based upon the Pre-Sentence Report ("PSR"), the attached Memorandum of Points and Authorities, all letters and documents filed hereto, and upon any oral argument that may be presented at the sentencing hearing pursuant to Federal Rules of Criminal Procedure, Rule 32(c)(1).

Dated:    September 13, 2023

Respectfully submitted,

WERKSMAN JACKSON & QUINN LLP

/s *Caleb Mason*

_____

Caleb E. Mason
Jacqueline Sparagna
Attorneys for Defendant
MOHAMMAD JAWAD ANSARI

**DEFENDANT MOHAMMAD JAWAD ANSARI'S
SENTENCING MEMORANDUM**

# I.
## INTRODUCTION

On May 9, 2023, Mr. Ansari was convicted on one single count of 18 U.S.C. § 2244(b), Abusive Sexual Contact in the Special Aircraft Jurisdiction of the United States, for touching the thigh of the passenger seated next to him on a flight, while that passenger was asleep.  The Court remanded Mr. Ansari into custody on that date. The statutory maximum sentence is two years' custody. On August 18, 2023, Probation filed its Presentence Investigation Report ("PSR"), calculating a base offense level of 12 under the United States Sentence Guidelines ("U.S.S.G.") § 2A3.4. Probation requests a two-level adjustment for vulnerable victim under U.S.S.G § 3A1.1, for a total offense level of 14, resulting in a Guideline range of 15-21 months.

As set forth herein, Mr. Ansari requests a sentence of time served, which will, as of the date of sentencing be 136 days (four months), or a Level 9/Category I sentence.

# II.
## STATEMENT OF FACTS
### A. FACTS PERTAINING TO THE OFFENSE AND TRIAL

On the morning of February 17, 2020, Mr. Ansari was a passenger on a flight from Cleveland to Los Angeles. During the flight, the passenger seated next to him, a flight attendant travelling to her next job assignment, reported to the flight attendants on the plane that Mr. Ansari had touched her inner thigh while she was sleeping. (PSR, at ¶ 1-2.) Upon arrival in Los Angeles, Mr. Ansari was detained for questioning by FBI agents, then released. (PSR, at ¶ 11.)

On October 6, 2020, the government filed an indictment against Mr. Ansari. Between his arraignment and trial, a period of more than two years, Mr. Ansari was under the supervision of Pretrial Services. He complied with all conditions of his release, and appeared at every hearing. (PSR, at ¶ 4.)

**DEFENDANT MOHAMMAD JAWAD ANSARI'S
SENTENCING MEMORANDUM**

1   Mr. Ansari's trial was held between May 2 and May 9, 2023.  On May 9,
2   2023, Mr. Ansari was found guilty. The Probation Officer interviewed him on
3   August 4, 2023. (PSR, at ¶ 17.)

4   **B. MR. ANSARI'S PERSONAL HISTORY**

5   **1.  Mr. Ansari's Personal and Family Life**

6   Mr. Ansari was born on June 28, 1973, in Karachi, Pakistan, to Mohammad
7   Akbar Ansari and Bilquis Ansari. His father is 89 years old and is a retired
8   attorney in failing health. His mother passed away at the age of 80 in 2017. Prior
9   to this incident, Mr. Ansari took care of his father, but his father has moved back
10   to Pakistan in Mr. Ansari's absence; Mr. Ansari hopes that upon his release, his
11   father can return and he can care for him again. (PSR, at ¶ 45.) Mr. Ansari is one
12   of seven siblings; he has four brothers, Mohammad Vicki (58), Mohmmad Zulfi
13   (54), Mohammad Shazi (53), Mohammad Hammad (41) and a brother and sister
14   who have passed away. (PSR, at ¶ 46.)

15   Although his parents were loving and provided all his basic needs, Mr.
16   Ansari experienced years of mental, physical, and sexual abuse from other family
17   members, a servant, and his tutor. Between the ages of six to ten, his older cousin,
18   who had moved into his house after his mother, Mr. Ansari's aunt, was murdered
19   by her husband, sexually abused him. At age ten, a male servant at his friend's
20   home raped him. At around age thirteen, his tutor also sexually abused him over
21   the course of a year. Mr. Ansari has struggled with disclosing his sexual abuse to
22   anyone, and feels guilt and shame over it. (PSR, at ¶ 48.) He began individual
23   mental health treatment in the form of therapy in the summer of 2021, which is the
24   first time he was able to speak about the sexual abuse he experienced. He has
25   found it helpful and would like to continue therapy in the future. (PSR, at ¶ 66.)

26   During Mr. Ansari's childhood in Pakistan, a military coup imposed martial
27   law, and a military dictatorship ruled the country. (PSR, at ¶ 47.) Mr. Ansari has
28   described growing up in Pakistan as violent and remembers living in a constant

2
**DEFENDANT MOHAMMAD JAWAD ANSARI'S**
**SENTENCING MEMORANDUM**

state of fear. Mr. Ansari recalls friends who went missing, died, or became severely and permanently injured as a result of the militants in Pakistan. (PSR, at ¶ 49.) He also recalls physical abuse from his teachers, and not making any real friends until his family moved to a different neighborhood in the ninth grade. There was an instance where he was even held at gunpoint but was eventually let go after one of the individuals holding him down realized they were of the same ethnic group. Mr. Ansari cannot recall years of his childhood and believes he blocked out that violent and abusive part of his history. (ECF Doc. No. 89-2 (Romanoff Report) at pp. 13-14.) His experiences as a child have greatly impacted him, and given him a motivation to become a contributing member of society.

Mr. Ansari moved to the United States on September 7, 1991. (PSR, at ¶ 44.) He moved to Fullerton, California for college and after graduating, he married his first wife Saba Syed around October 1998. This was an arranged marriage by their families. The couple divorced around 2008 in Orange County, California. (PSR, at ¶ 52.) In December 2008, Mr. Ansari moved to Northern California in hopes of better opportunities and in 2009, he met and married Sabrina Mello Da Silva. They divorced in 2011 and Mr. Ansari remained in Northern California until around 2015 when he moved back to Orange County. (PSR, at ¶ 53.) He has no children. (PSR, at ¶ 52-53.)

In terms of his community involvement, Mr. Ansari is known for his deep ties to the community as well as being very charitable. (PSR, at ¶ 58.) In 2011, he began his conversion from Islam to Judaism and finished in 2015. (PSR, at ¶ 53.) Since then, he has found community among his new faith. Two Rabbis have described Mr. Ansari as an active member in the Jewish community who regularly attends Sabbath services and social programs. (PSR, at ¶ 59.) Mr. Ansari is a firm believer in giving back to the community and makes regular charitable donations. (PSR, at ¶ 86.) He also credits his ability to handle stress and mental health

struggles more effectively to his increased religious and spiritual involvement in the Jewish community. (ECF Doc. No. 89-2 (Romanoff Report) at p. 7.)

Mr. Ansari has no criminal history. (PSR, at ¶ 37-38.)  Throughout his life, Mr. Ansari has focused on his career and taking care of his family. He was the primary caretaker of his late mother and continued to take care of his elderly father up until this incident. Those who know Mr. Ansari, family members and long-time friends, describe him as loyal, hardworking, sincere, kind, dependable, compassionate, a mentor, a trusted friend, and a man with solid values. (PSR, at ¶ 58.) Business associates and religious leaders have also attested to his "exceptional character and integrity," stating that he possesses "a high level of honor and ethical behavior." (PSR, at ¶ 59.) The Court's docket contains multiple character letters and declaration attesting to his good character, incorporated here by reference: ECF Doc. Nos. 171-2 (Letters from Laura Anthony and Nadya Zaychenko); 171-7 (Declaration of Eric Berg); 171-8 (Declaration of Jasmine Shih); 171-9 (Declaration of Daniel McCrory); 171-10 (Declaration of Jim Alexander); 171-11 (Declaration of Keith Moore); 171-12 (Declaration of Hamad Ansari); 171-13 (Declaration of Michael Chernak); 171-14 (Declaration of Neil Juneja); 171-15 (Declaration of Yitzchok Magalnik), 171-16 (Declaration of Yosef Levin) (collectively, "Character Letters").

## 2.  Mr. Ansari's Education and Employment History

Mr. Ansari struggled in school due to the abuse he experienced as well as being diagnosed with attention deficit hyperactivity disorder (ADHD). (PSR, at ¶ 50.) Despite the challenges he faced, he graduated high school and was accepted into an engineering program in Pakistan. While visiting the campus, he was caught up in the violent suppression of a student protest, and his excitement about college quickly turned to fear. Mr. Ansari applied to and was accepted to Fullerton College in California, where his older brothers were residing. (PSR, at ¶ 51.) He relocated at the age of 17 and obtained his associate degree from Fullerton

College in 1992 as well as his bachelor's degree in business from California State University-Fullerton in 1994. (PSR, at ¶ 70-71.)

Since graduating, Mr. Ansari has obtained multiple licenses including a Series 7 FINRA license and a CPA license. (PSR, at ¶ 73.) Throughout his career, he has worked at multiple accounting, finance, and technology companies. (PSR, at ¶ 75-77.) He worked for tech startups, as an independent contractor, and was a managing director for BOUSTAD Securities from 2015 to 2020. (PSR, at ¶ 75.) Mr. Ansari has been a partner since 2017, in a consulting company called Basestones, located in Los Angeles. (PSR, at ¶ 74.)

With a passion for business, he plans to continue with his current ventures. (PSR, at ¶ 78.) However, he has also gained interest in the field of law. While incarcerated, Mr. Ansari is studying for the LSAT in hopes of one day attending law school and becoming a lawyer. (PSR, at ¶ 72.)

## III. ARGUMENT

18 U.S.C. §3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing. Under §3553(a), factors considered to make this determination include: 1) the nature and the circumstances of the offense and the history and characteristics of the defendant; 2) the purposes of sentencing; 3) the kind of sentences available, 4) the United States Sentencing Guidelines calculation; 5) pertinent policy statements; 6) the need to avoid unwarranted sentence disparities; and 7) the need to provide restitution. 18 U.S.C. §3553(a). As set forth herein, all §3553(a) factors, considered together, warrant consideration of a sentence of four months' custody.

## A.    HISTORY AND  CHARACTERISTICS OF MR. ANSARI

"While the Guidelines are to be respectfully considered, they are one factor among the §3553(a) factors that are to be taken into account in arriving at an

1   appropriate sentence." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).
2   Thus, all of the other considerations set forth in §3553, including the history and
3   characteristics of Mr. Ansari, are of equal importance to the guidelines range.
4   *Booker*, 543 U.S. at 246; see also *United States v. Ranum*, 353 F. Supp. 2d 984,
5   990 (E.D. Wis. 2005). As one court noted, "Surely, if ever a man is to receive
6   credit for the good he has done, and his immediate misconduct assessed in the
7   context of his overall life hitherto, it should be at the moment of his sentencing,
8   when his very future hangs in the balance. This elementary principle of weighing
9   the good with the bad, which is basic to all the great religions, moral philosophies,
10  and systems of justice, was plainly part of what Congress had in mind when it
11  directed courts to consider, as a necessary sentencing factor, 'the history and
12  characteristics of the defendant'." *United States v. Adelson*, 441 F. Supp. 2d 506
13  (S.D.N.Y. 2006). Here the history and characteristics of Mr. Ansari show that he
14  has persevered through hardships to become a valuable contributing member of
15  society who makes others' lives better.  Mr. Ansari escaped an abusive childhood
16  in a dangerous and violent country, came to America and became a good solid
17  American.  The character letters from those who know him are a testament to his
18  good character.  Sentencing, as the above cases emphasize, should be about the
19  whole person.  He was convicted of this offense and must be sentenced for it; but
20  he must be evaluated for all that his, not just that one incident.

21       **1.   THE INSTANT OFFENSE WAS ABERRANT**

22       The section §3553(a) analysis includes whether a defendant's offense
23  conduct was aberrant. Aberrant conduct is conduct that represents a "short-lived
24  departure from an otherwise law-abiding life." *Colace*, 126 F.3d at 1231. There is
25  an "aberrant behavior spectrum" to be considered in determining when the aberrant
26  behavior departure should apply. *United States v. Takai*, 941 F2d 738, 743 (9th
27  Cir. 1991). If the district court finds a "convergence" of factors "demonstrating

**DEFENDANT MOHAMMAD JAWAD ANSARI'S**
**SENTENCING MEMORANDUM**

that a defendant's actions '"constitute an act of aberrant behavior,'" then a lower sentence is justified. See *United States v. Rojas-Millan*, 234 F.3d 464, 475 (9th Cir. 2000), citing *United States v. Dickey,* 924 F.2d 836, 838 (9th Cir.1991). In discussing aberrant behavior, the Ninth Circuit has held that a totality of the circumstances test is applied. See *United States v. Guerrero*, 333 F.3d 1078, 1081 (9th Cir. 2003), noting, *United States v. Takai*, 941 F.2d 738, 743-744 (9th Cir. 1991), amended and superseded on other grounds, 930 F.2d 1427 (9th Cir. 1991). Under this test, a court may consider factors, including 1) the singular nature of the criminal act; 2) spontaneity and lack of planning; 3) the defendant's criminal record; 4) psychological disorders from which the defendant was suffering; 5) extreme pressures under which the defendant was operating; 6) letters from friends and family expressing shock at the defendant's behavior; and 7) the defendant's motivation for committing the crime. *United States v. Working*, 224 F.3d 1093, 1099 (9th Cir. 2000). Aberrant behavior is best assessed "in the context of the defendant's *day-to-day life*" and not solely "with reference to the particular crime committed." *Working*, 224 F.3d at 1100, citing with approval *United States v. Martinez*, 207 F.3d 133, 137 (2d Cir. 2000).

Here, Mr. Ansari does not have a criminal history and has never been accused of any sort of misconduct (sexual or violent) other than in this case. (PSR, at ¶ 36-42.) Between April 2010 and February 2020, Mr. Ansari flew several hundred flights without any incidents, absent this one, in those ten years. (PSR, at ¶ 18; ECF Doc. 171-3 (flight history records).) Despite his extensive history of mental health issues and sexual abuse, he has always been—and remains—a functional, upstanding, and contributing member of society. This was a singular incident, there is no history of him engaging in similar conduct in the past nor is there any indication that he would engage in similar behavior in the future.

The Character Letters all describe him as respectful, honest, dependable, and compassionate.  His younger brother, Hammad, emphasizes the care that Mr.

**DEFENDANT MOHAMMAD JAWAD ANSARI'S**
**SENTENCING MEMORANDUM**

1   Ansari has for others – taking care of their elderly father, being a protective older
2   brother to him, and supporting various charities for causes that are dear to his
3   heart.  ECF Doc. No. 171-12Jasmine Shih, a friend that has known him for over 10
4   years describes him as respectful and courteous – stating that the accusations
5   against him are "completely out of logic" for various reasons.  ECF Doc. No. 171-
6   8. The behavior that Mr. Ansari was convicted of has come to a shock to many of
7   his friends and family as he has never said "anything inappropriate or behave[d] in
8   any manner other than as a law-abiding upstanding citizen" in the years that they
9   have known him. ECF Doc. No. 171-2.

10      The crime for which Mr. Ansari has been convicted of is not typical
11   behavior for him. The instant offense was aberrant.

12      **2.   INCARCERATION WOULD IMPACT MR. ANSARI'S**
13           **BUSINESS**

14      Another consideration under the history-and-characteristics analysis is the
15   effect that incarceration would have on Mr. Ansari's business. As noted above,
16   post-*Booker*, a Guidelines-variant sentence under §3553 does not need to be based
17   on "extraordinary" circumstances. However, even under the more exacting (pre-
18   *Booker*) departure standards, extraordinary circumstances have been found where
19   the defendant's incarceration would affect innocent employees. See *United States*
20   *v. Milikowsky*, 65 F.3d 4 (2d Cir. 1995) ("offender's employees, 'to a degree[] not
21   adequately taken into consideration by the Sentencing Commission,' warrant a
22   downward departure." (citations omitted)); *United States v. Olbres*, 99 F.3d 28 (1st
23   Cir. 1996) (holding that loss of jobs to innocent employees occasioned by
24   defendants' imprisonment was not categorically excluded as basis for departure).

25      For example, the court in *Milikowsky* found a downward departure was
26   warranted because of the high probability of business failure in the defendant's
27   absence. *Milikowsky* 65 F.3d at 8. The court noted that a permissible justification
28   for a downward departure is the need, "to reduce the destructive effects that
    incarceration of a defendant may have on innocent third parties." *Id*. at 7.

8
**DEFENDANT MOHAMMAD JAWAD ANSARI'S**
**SENTENCING MEMORANDUM**

Here, Mr. Ansari is a partner in a consulting company, and was—and hopefully will be again—the primary caregiver for his elderly father. (PSR, at ¶ 74.)  However, if he remains incarcerated for an extended period of time, his business ventures may founder.  He may lose his home, and be unable to take in an care for his father again.

## B.    SECTION 3553(a) FACTORS CONCERNING THE SENTENCING GUIDELINES CALCULATION AND POLICY STATEMENTS WARRANT A LESSER SENTENCE

Of course, the Guideline calculation, and any pertinent policy statement, are still relevant in determining an appropriate sentence.  See, Menyweather, supra.  In the PSR, Probation argues that the base offense level is 12 pursuant to §2A3.4. Probation also requests a two-level adjustment for vulnerable victim pursuant to §3A1.1(b)(1). As Set forth in Mr. Ansari's Objections, Mr. Ansari objects to the upward adjustment, and requests a two-level decrease pursuant to §4C1.1.

### 1.    A TWO-LEVEL INCREASE FOR VULNERABLE VICTIM IS NOT  WARRANTED BY THE INSTANT FACTS

U.S.S.G. §3A1.1(b)(1) provides "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." It is exceedingly rare that an entire "class" of victim would qualify as vulnerable. However, it has been found that "[i]n some cases the inference to be drawn from the class characteristics may be so powerful that there can be little doubt about unusual vulnerability of class members within the meaning of section 3A1.1." U.S. v. Gill, 99 F.3d 484, 487 (1st Cir. 1996) (patients at mental health clinics defrauded by defendant). There are few other examples. See *United States v. Drapeau*, 110 F.3d 618, 620 (8th Cir.1997) (one-year-old abuse victim considered vulnerable, with no further facts); *United States v. Salemi*, 26 F.3d 1084, 1088 (11th Cir.1994)

(kidnapped six-month-old baby was vulnerable victim); *United States v. Boise*, 916 F.2d 497, 506 (9th Cir. 1990) (six-week-old "unusually vulnerable" due to age).

Typically, age and physical or mental condition is not, standing alone, sufficient evidence of unusual *vulnerability*. Rather, there must be some showing that the particular victim was vulnerable based on a totality of the circumstances. See, e.g., *United States v. Checora*, 175 F.3d 782, 789–90 (10th Cir.1999) (fact that victim of assault was small properly considered as one of several factors using "totality of circumstances" test to determine vulnerability); *United States v. Fosher*, 124 F.3d 52, 56 (1st Cir.1997) (remanding vulnerable victim finding, based on victim's age (sixty-two) and home invasion robbers' decision that guns were unnecessary, because district court "failed to address the 'individual characteristics' required to support a finding that a particular victim was unusually vulnerable"); *United States v. Tissnolthos*, 115 F.3d 759, 761–62 (10th Cir.1997) (fact that assault victim was seventy-one insufficient—court must make "particular findings of the actual victim's unusual vulnerability")

In requesting the two-level increase, Probation relies on *United States v. Wetchie*, 207 F.3d 632 (9th Cir.2000). Probation implies that the "class" of sleeping alone, makes a victim vulnerable. However, nothing about *Wetchie* indicates that the Ninth Circuit intended to take the unusual step of making a sleeping person (a condition most people are in approximately 1/3 of their life) the same as a six-month baby or a dependent mental patient. Instead, in that case, the Ninth Circuit conducted the required evaluation of the specific victim and found her vulnerable. The victim in *Wetchie* was 11 years old and was living at a group home for Native American children who had made wards of the court. The crime took place at night while the children were asleep in their beds, and the defendant was a "house parent" at the facility who was entrusted with the care of the children. Thus, the court found that she qualified as a vulnerable victim.

This Court must conduct an individualized assessment of whether there is a vulnerable victim that is based on a totality of the circumstances. The incident at issue in this case involved adults, on a crowded plane, during the day. The victim was a strong and healthy adult with no disabilities, who held a position as a uniformed flight attendant, a position of power and authority on planes. Under a totality of the circumstances and as discussed in Defendant's Objections to Presentence Report, she was not vulnerable and the language of *Wetchie* should not be the basis for applying the adjustment as a result or matter of law in the instant matter.

## 2.    THIS COURT SHOULD APPLY THE TWO-LEVEL DECREASE UNDER §4C1.1

The amendment to U.S.S.G, §4C1.1, which will take effect on November 1, 2023, provides for a two-level reduction in offense level for defendants, like Mr. Ansari, who have zero criminal history points. As set forth in Mr. Ansari's Objections to the PSR, ECF Doc. No. 179, although the provision has not yet gone into effect, the Sentencing Commission has taken the unusual step of determining that the two-level decrease will be retroactive pursuant to 18 U.S.C. §3582(c)(2). As a result, as set forth in Mr. Ansari's Objections, Mr. Ansari requests the two-level decrease for zero criminal history points.

## C.    SECTION 3553(A) FACTORS CONCERNING THE NEED FOR THE SENTENCE IMPOSED

The next factors under §3553(a) concern the need for a particular sentence. The mandatory principle of §3553 is a limiting one: the sentence must be "sufficient, but not greater than necessary," to satisfy: (2) the need for the sentence imposed - - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational

training, medical care, or other correctional treatment in the most effective manner.18 U.S.C. §3553(a)(2) (emphasis added). Courts have recognized that they must honor this parsimony provision. See, e.g., *Carty*, supra, 520 F.3d at 991; see also *United States v. Spigner*, 416 F.3d 708, 711 (8th Cir. 2005).

## 1.   SERIOUSNESS OF THE OFFENSE AND THE NEED TO PROVIDE JUST PUNISHMENT

18 U.S.C. §3553 mandates that the court consider the need for the sentence imposed to provide just punishment for the offense. 18 U.S.C. §3553(a)(2)(A). In order to determine whether a punishment is "just," a number of factors need to be considered. A "just" punishment is punishment that "fit[s] the crime." *Simon v. United States*, 361 F. Supp. 2d 35, 43 (E.D.N.Y. 2005), quoting S. Rep. 98-225, 1984 U.S.C.C.A.N. 3182, 3258-59). The punishment should not be unreasonably harsh under all of the circumstances of the case. See *United States v. Wilson*, 350 F. Supp. 2d 910, 917 (D. Utah 2005); citing S. Rep. 98-225, 1984 U.S.C.C.A.N. 3182, 3258-59. The Guidelines require discussion and specific consideration of each offense's seriousness.

Sex offenses are typically state crimes. Federal law, however, applies, as here, in certain contexts such as interstate airline travel. As relevant here, Chapter 109A distinguishes a "sexual act," a more sever type of sexual conduct, from "sexual contact," which "means the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(3).

The conduct charged in the instant case is touching of the thigh. By comparison, in California the conduct charged here would not be a sexual assault or sexual battery at all; it would be simple misdemeanor battery. Misdemeanor sexual battery in California requires, inter alia, that the touching be of "an intimate part." California defines an intimate part as "a female's breast or the anus, groin,

sexual organ, or buttocks of anyone." CA Pen. Code § 243.4(g)(1). The federal definition under the charge of conviction here is more expansive, including "thigh."  When comparing sentences for comparable crimes, therefore, to the extent the Court considers state sentences relevant, the relevant comparison set would be sentences for simple battery—what this case would be if all the same facts were charged and proved in state court. Simple battery sentences typically range from probation to six months.  *See, e.g.*, *People v. Conley* (2004) 116 Cal.App.4th 566 (probation); *People v. Abrego* (1993) 21 Cal.App.4th 133 (6 months); *People v. McGarry* 96 Cal.App.4th 644 (2002) (6 months); *James v. State of California* (2014) 229 Cal.App.4th 130 (probation).

## 2.   THE NEED TO PROTECT THE PUBLIC

Another factor to consider in determining the need for the sentence imposed is whether or to what extent society needs to be protected from the defendant.  Mr. Ansari has demonstrated through his own conduct that he is capable of leading a law-abiding, productive life. He has no criminal history and no allegations of similar conduct in the past. There is no indication that Mr. Ansari will engage in similar conduct in the future. Moreover, he has integrated himself into the Jewish community, finding others who share the same beliefs and have guided him in his spiritual journey. Rabbi Yosef Levin stated, "I cannot imagine he would ever be a threat to anybody, and he continues to be welcome in my house and my community." (ECF Doc. No. 171-16, Letter from Rabbi Yosef Levin.) Mr. Ansari does not pose a threat to society, and there is no indication that he would engage in criminal conduct in the future.  There simply is no factual basis for a "he might do it again" argument from the government.  He has flown hundreds of times with no allegation of any misconduct.  This conduct—even taking, based on the verdict, every negative inference against Mr. Ansari—was an aberration in an otherwise completely law-abiding life.

1

### a.   THERE IS A LOW LIKELIHOOD OF RECIDIVISM

The Court should consider this low risk of recidivism in assessing the need to protect the public from any future crimes by Ansari. See *United States v. Ruiz*, No. 04 CR.l 146-03, 2006 WL 1311982 at *4 (S.D.N.Y. May 10, 2006) (noting courts have imposed non-guidelines sentences for defendants based on age due to markedly reduced recidivism risk); *Gardellini*, 545 F.3d at 1091 (affirming district court's sentence of a fine and five years of probation rather than 10 to 16 months of imprisonment under the guidelines based in part on defendant's low risk of recidivism); *Hoffmann*, 2006 WL 3390736 at *6 (because of defendant's low risk of recidivism, court sentenced defendant to three years of probation instead of 8 to 14 months under guidelines); *United States v. Nellum*, No. 2:04-CR-30-PS, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (based on defendant's age and lower risk of recidivism, court reduced sentence from 168-210 months to 108 months).

Even if this Court finds that Mr. Ansari is not entitled to the two-level reduction under §4C1.1, his status as a zero-point offender is still particularly relevant in determining recidivism. When considering the amendment to §4C1.1, the Commission found that: offenders with zero criminal history points ("zero-point offenders") have considerably lower recidivism rates than other offenders, including offenders in CHC I with one criminal history point. "zero-point" offenders were less likely to be rearrested than "one point" offenders (26.8% compared to 42.3%). This represents the largest difference in recidivism rates of any comparison of offenders within the same criminal history category.

Over the past two decades the Sentencing Commission has extensively studied recidivism. The Commission's 2016 study examined factors correlative with reduced recidivism and concluded that the following factors were especially correlated with a low recidivism risk:

• **Age**: Recidivism rates decline consistently as age increases, with offenders 51-60 measuring at the second lowest level. U.S. Sentencing

Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* 23 (March 2016), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

　　• **Education**: Recidivism rates decline with increased education level, with college graduates having the lowest rate of recidivism of around. *Id* at 24. Mr. Ansari has a college degree.

　　• **First-time Offender**: The rate of recidivism for first offenders is the lowest. *Id* at 18. Mr. Ansari has no criminal history points and is a first-time offender.

　　The Sentencing Commission reports:

> Criminal history points represent the purest form in which the guidelines measure recidivism risk. The CHC is not as pure in its form because the CHC is an aggregation of points into one of only six categories. Therefore, the sum of criminal history points is the primary source for evaluating the predictive ability of the current criminal history Chapter Four provisions. Not surprisingly, therefore, when predicting the primary measure of recidivism, criminal history points also perform well.[1]

　　When the two factors of age and lack of criminal history are combined is where the numbers really show the promise of low recidivism. The Commission found "consistent with existing research, two factors—offenders' criminal histories and their ages at the time of release into the community—were most closely associated with differences in recidivism rates." *Id*. at 27. Finally, as for types of offense and recidivism, the most likely federal offense to recidivate is

---

[1] U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 7-8 (footnote omitted) (May 2004), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

**DEFENDANT MOHAMMAD JAWAD ANSARI'S
SENTENCING MEMORANDUM**

firearm offenses, followed by robbery, immigration, drug trafficking, larceny, other, then fraud. *Id*. at 20.  All of the above factors point to a minimal risk of recidivism here: Mr. Ansari is 50; he has a college degree; he is a first-time offender; and the offense of conviction is not one presenting a statistical likelihood of recidivism.

Based on his history of mental health and abuse, in addition to his utter lack of a criminal history, therapy rather than prison would be the most effective way to rehabilitate Mr. Ansari. Moreover, he has found a community that he can rely on as he has stated that his spiritual involvement in this religious community has greatly changed the way he handles his mental health struggles.

Finally, it should be noted that Mr. Ansari faces serious risks of violent attack in prison.  He is a Muslim from Pakistan who converted to Judaism in the United States.  Accordingly to some Muslim religious tenets, including some held by sects prevalent in the United States, he is an apostate whose religious offense is punishable by death.  Mr. Ansari must go through life racially and religiously profiled as a Muslim—an ethnic and cultural identity he was born with and carries with him—and at the same time subject to attack by radical Muslims because of his conversion to Judaism. Society does not benefit by putting him in an environment where he will be subject to potential violent religious attack.

## D.   THE TYPES OF SENTENCES AVAILABLE

18 U.S.C. §3582(a) provides that, "the court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in §3553(a) to the extent that they are applicable." 18 U.S.C. §3582(a) (emphasis added). §3553(a) requires consideration of the "kinds of sentences available." 18 U.S.C. §3553(a)(33). Thus, under §3582, this Court should consider whether a term of imprisonment is appropriate in the instant case and, if some term is necessary, what types of sentences are available. In determining whether to impose a term of

**DEFENDANT MOHAMMAD JAWAD ANSARI'S**
**SENTENCING MEMORANDUM**

imprisonment, it is relevant to note that in enacting the Sentencing Reform Act of 1984 ("SRA"), Congress intended that "prison resources [would be], first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." See Sentencing Reform Act of 1984, Pub. L. No. 98-473, §§217(a), 98 Stat. 1987, 2039 (1984). Congress thus instructed the Commission to ensure "that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. §994(u) (2012). Despite the statutory goals of Congress, Guideline sentences have resulted in a larger prison population.[2] At year-end 2006, the Bureau of Prisons was 37% over capacity.[3] Increases in sentence lengths for drug trafficking offenders are the major cause of federal prison population growth over the past fifteen years. See Fifteen Year Report, supra, at 50.

---

[2] The federal prison population was 44,408 in 1986, 48,300 in 1987. See Katherine M. Jamieson and Timothy Flanagan, eds., Sourcebook of Criminal Justice Statistics - 1988, tbl. 6.34, Department of Justice, Bureau of Justice Statistics, Washington, DC: USGPO, 1989. Currently, the population is approximately 201,214. See Timothy J. Flanagan & Katherine M. Jamieson, Sourcebook of Criminal Justice Statistics, 1988, tbl. 6.34 (Hindelang Criminal Justice Research Center 1989); Quick Facts About the Bureau of Prisons, www.bop.gov, (Oct. 10, 2012, 8:57 PM), http://www.bop.gov/news/quick.jsp# 1.

[3] U.S. Department of Justice, Bureau of Justice Statistics Bulletin, Prisoners in 2006 S, available http://www.ojp.usdoj.gov/bjs/pub/pdf/p06.pdf

**DEFENDANT MOHAMMAD JAWAD ANSARI'S
SENTENCING MEMORANDUM**

Thus, under 18 U.S.C. §3582(a), this Court could determine that a term of imprisonment is not warranted, without consideration of the factors set forth in §3553(a). See 18 U.S.C. §3582(a). Indeed, under §3553(a), the "types of sentences" available absolutely include the use of probation. This finding was reinforced in Gall, where the Supreme Court recognized the value of a probationary sentence under the SRA and §3553(a), even when probation is not called for by the total offense level. 552 U.S. at 44.

The defendant in *Gall* was a college student who was using MDMA, or "ecstasy," and joined an ongoing conspiracy to distribute that drug. *Id*. at 41. The defendant, on his own accord, then decided to stop using and distributing the drug. *Id*. By the end of the defendant's involvement in the distribution ring, the defendant had distributed at least 2,500 grams of MDMA and netted a profit of over $30,000. *Id*. at 41-42. Probation recommended a guideline range of 30-37 months. *Id*. at 38. However, the court sentenced Mr. Gall to a term of probation. In upholding the sentencing court's finding, the Supreme Court specifically endorsed the value of probation as an available sentence under §3553(a), when reasonable as determined by the district court in a particular case. *Id*. at 56. The Court rejected the position that probation "lies outside the range of choice dictated by the facts of this case" because "§3553(a)(d) directs the judge to consider sentences other than imprisonment," *id*. at 58-59, and directed sentencing courts to "consider every convicted person as an individual," and that sentencing cannot be treated as "merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Id*. at 52.

The Court also noted: "Probation is not granted out of a spirit of leniency." *Id*. at 48, n. 4 (quoting Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957)). "Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty." *Id*. (citing *United States v. Knights*, 534 U.S. 112, 119 (2001) (finding

"Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'")). "Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking." *Id*. at 48 (citing U.S. Sentencing Guidelines §5Bl.3). The court also noted, "Most probationers are also subject to individual 'special conditions' imposed by the court."[4] *Id*. at 48-49.

Thus, this Court should consider whether, based on the unique facts of the instant case, a term of probation, or other non-custodial sentence, is available. The instant offense is not a violent crime and Mr. Ansari has shown no propensity toward committing future crimes. Furthermore, Mr. Ansari has complied with all of the terms and conditions of his pre-trial release and has demonstrated that he is amenable to supervision. The instant case is one where the "type of sentence" imposed need not be imprisonment.

First, a sentence of four months, or time served, would be consistent with a Level 9 sentence. The Court could depart down to Level 9 under section 5H1.6 on the grounds that Mr. Ansari was, and will be upon his release, the primary caregiver for his elderly and infirm father. Or the Court could simply vary from the Guidelines range and impose a sentence of four months under section 3553. The Court could also impose a sentence of probation, conditions of which could include house arrest or location monitoring, or a prohibition on air travel.

---

[4] Additionally, the Sentencing Guidelines provide that, "[c]ommunity service may be ordered as a condition of probation or supervised release" U.S.S.G. §5Fl.3. The Court of Appeals for the Ninth Circuit has held that community service conditions further the statutory goal of providing the defendant with correctional treatment in the most effective manner. *United States v. Vega*, 545 F.3d 743, 748 (9th Cir. 2008) (citing *United States v. McKissic*, 428 F.3d 719, 724 (7th Cir. 2005)).

19
**DEFENDANT MOHAMMAD JAWAD ANSARI'S**
**SENTENCING MEMORANDUM**

In sum, under section 3553, imposing the statutory maximum of two years' custody would be excessive and unwarranted, and imposing a sentence within the 15-21 month range of Level 14 is unnecessary to satisfy the multifaceted analysis of §3553. Such a sentence would be greater than necessary. Mr. Ansari respectfully requests that the Court impose a sentence that releases him from custody so that he can resume his life and resume his care for his elderly father.

## IV.
## CONCLUSION

For the reasons set forth above, Mr. Ansari respectfully requests that this Court sentence him to time served, or four months' custody; or, alternatively, to a sentence of probation.

Dated:   September 13, 2023                    Respectfully submitted,

                                              WERKSMAN JACKSON & QUINN LLP

                                              /s *Caleb E. Mason*
                                              _____
                                              Caleb E. Mason
                                              Jacqueline Sparagna
                                              Attorneys for Defendant
                                              MOHAMMAD JAWAD ANSARI

20

**DEFENDANT MOHAMMAD JAWAD ANSARI'S**
**SENTENCING MEMORANDUM**